Case number 3-17-0288, People of the State of Illinois, Appalachia v. Lamarie Wilson-Neuelib, Appalachia. Good afternoon, gentlemen. Thanks for joining us in the Zoom argument. Justice Schmitt and Justice Carter are live. You just don't see a video. Hello. As I said, there he is, Justice Carter. Mr. Wigman, if you want to proceed. Thank you, Your Honor. May it please the Court, Counsel, I am Jay Wigman, an Assistant Appellate Defender for the Office of the State Appellate Defender, Counsel for Defendant Appellant Lamarie Wilson-Neuelib, who asserts that this matter should be remanded for a new sentencing hearing so that the trial court can properly consider the defendant's youth and its attendant characteristics in light of the Supreme Court's determination in People v. Butler, I'm sorry, Buffer, that 40 years equals a de facto life sentence, which can only be imposed if the trial court determines that the defendant is irretrievably depraved, permanently incorrigible, or irreparably corrupt. My opening brief is dramatically different from the argument that's being presented at this point, and it reflects the evolution of Miller and other cases that the U.S. Supreme Court has considered and the evolution of the way that we treat and view juvenile offenders of very serious crimes. Originally, when I wrote this brief, I challenged the defendant's sentence as excessive for two separate reasons. First, that the court failed to adequately consider the defendant's rehabilitative potential under the new sentencing scheme as set forth in 730 ILCS 5-5-4.5-105. And secondly, because of the risk that the court's decision was improperly influenced by the admission of an excessive number of sometimes inappropriate victim impact statements, as well as a tribute video. After Buffer came out, then that changed the argument considerably. And now the question remains whether the circuit court, which admitted at the time that it did not know what a de facto sentence was, intended to impose a de facto sentence. The evidence within the court's conversations with counsel and what was presented at the sentencing hearing are unclear to that, but clearly somewhat suggest that the court did not intend to impose a de facto sentence. So I plan on focusing on the first portion of the argument as to why the defendant's sentence is excessive and inappropriate. But certainly, if time permits, and if there are questions, I will address the latter issue concerning the victim impact statements. This court is well familiar with the landscape that has surrounded and has changed throughout such cases in the U.S. Supreme Court as Roper, Graham, and Miller. It started with Roper, in which it was found that capital punishment for juveniles who commit murder was inappropriate. In Graham, it developed that a mandatory life sentence for juveniles who commit non-homicide was not appropriate. And in Miller, it was determined that there can be no constitutional mandatory life sentence for juveniles who commit homicide. There has also been a statutory change here in Illinois, reflecting the factors that were first enunciated in People v. Holman. In 730 ILCS 5-5-4.5-105, nine factors were enunciated that are to be used to determine whether the mandatory minimum is appropriate, and specifically, whether the 25-year add-on for firearms should be imposed. And it was in that light that the circuit court considered this factor, and it's important to note that the factors were imposed in this decision was made prior to the decision in buffer. It should also be noted that those nine factors are all to be considered in mitigation towards the defendant. And it reflects the change from Roper and Graham and Miller and on down the line that juveniles are viewed differently than they are than are adults. And it's for that reason that one of the citations made by the state in its brief to People v. Vega is inappropriate because Vega was an adult. And the cases that Vega relied upon involved adults. Here we're looking at a juvenile who had had difficulty with the delinquency system, who had a past, who had a very troubled home life. And these are among the nine factors that are set forth in the statute that are to be used to determine whether the defendant has rehabilitative potential. Mr. Wigman, didn't the trial judge specifically consider those? The judge specifically considered the factors, and I have two arguments about that. One is that I don't believe that he did so in the proper fashion. But the second is that those factors are to be used to determine whether a de facto sentence is appropriate. And the problem is that the judge and the attorneys were arguing in the dark in this case because nobody knew at the time what a de facto sentence was. And the judge admitted that and commented, we don't know what a de facto sentence is. And because the judge did not know what a de facto life sentence was, it can't be maintained that he entered the sentence that he did knowingly. That he did so because he thought that a de facto sentence was appropriate. In fact, the judge rejected the state's request for a 70-year sentence, which is clearly a de facto sentence. And the court and counsel discussed exactly where within that range it lay. Sanders, I think, had set the age at 60. There were other cases that were discussing where this should be drawn. Even within Buffer, there are little differences between exactly what the age is. But it clearly comes down to the fact that, and as was the decision in Buffer, 40 years is where de facto lies. The court in this case, not knowing what de facto was, didn't know what sentence was being imposed. And certainly can't be said to have done so knowingly and intentionally after considering the factors. It's for that reason that we're asking, and this is different from the request initially within the opening brief. The defendant is asking that this matter be remanded for a new sentencing hearing rather than simply a reduction of sentence. Turning then to the factors that were considered by the court. Again, and as is stated in the opening brief, we have issues with the manner in which this case was determined. In part because it goes against the analysis and the rationale of Miller and Roper and Graham. And Buffer in that we're looking at juveniles differently. And looking at the background that they have and the factors that influence not just the actions that they take. But the decision-making process and the way that they come to these decisions. And the fact that the court found, for instance, that the defendant's acts were premeditated. Premeditation by definition is inherent in any criminal offense. And the question is, does a juvenile, does a 17-year-old, a 16-year-old have the same capability to make a decision in a knowing and reasoned fashion as does a 30-year-old or a 40-year-old? And clearly the science shows that that's not the case. And the law has decided that that is not the case. No reasonable person would do what this defendant did, whether they were 16 or 40, right? And so if you talk about premeditation here, your argument might seem to be that, well, a juvenile couldn't premeditate something this horrific. And I don't think the cases have said that. No, and I apologize if that's the inference that I created. I think that everybody is capable of premeditation. But the question is, what influences that? And what ability does somebody who thinks of this, what ability does that person have to control his impulses or to mend his behavior? And it's different for a juvenile than it is for an adult. And that's what the case law makes clear. And that's one of the things that needed to be considered here is that obviously the defendant's judgment was improper. But that doesn't mean that in 30 or 40 years he can't be rehabilitated. In fact, he's much more likely to be rehabilitated than is a 30 or a 40-year-old because the thinking, the processes that he engages are unformed and undeveloped as compared to an adult. And that's among the reasons why the courts have limited a sentence not just to actuarial tables or where exactly is the line going to be, but also intend to provide a period of time for the defendant to return to society to reenter having been rehabilitated. And it's much more likely that a juvenile who may have the same premeditated act as an adult is more likely to be rehabilitated. It's these factors that needed to be considered with the defendant's rehabilitation in mind. And it is our position that the trial court didn't view all of those in that way. He discounted the defendant's troubled upbringing in a house of abuse and drug use and violence. And while the judge is correct that that didn't necessarily lead to this specific offense, but it led to the ability of the defendant to respond in that fashion and to commit offenses like this. It doesn't appear he was responding to anything. He was actively doing something. There was nothing about this offense that's a response, is there? Probably not. And the reason that I hesitate is that while there were some indications that this was planned, for instance, he suggested meeting someplace, then the victim suggested a different place and was at that place, saw the defendant and drove to him. And that kind of change may well have influenced the defendant's response and the feeling that he needed to react with violence. He asked for a meeting, got a meeting, and then showed up at the spot. So then the other people saw him and went over to see him for the meeting. And you think that was causing a reaction? Well, I don't know. The victim had set the meeting at the gas station and changed that site when they saw him. The trouble is that the way the defendant was raised and brought up and taught about violence, and there was specifically referred to by the expert a heightened arousal and response mechanism. And that's the type of thing that at 17 is going to be very different from when the defendant is 54. And again, while that is something for the trial courts to consider in determining whether or not to impose a de facto sentence, the fact of the matter is here that the court did not know and could not know what a de facto sentence was. And without that knowledge, it can't be said that the trial court considered these factors, setting aside whether I agree or disagree with the way the court treated the factors. It can't be said that the court considered these factors and decided that a de facto sentence was appropriate because the court didn't know what a de facto sentence was. So any of that is after buffer. Basically, you're saying any case where there was a sentence before buffer is going to have air. Any case dealing with the sentence of a person who was 17 after buffer has been decided is going to be air because you don't know what a de facto sentence is. Whenever the 40 years was set, you're never going to be able to determine that any case prior to setting 40 years as a life sentence is going to have an air. I don't think so. No. And the reason that I say that is that the judge here was clearly, I don't want to say on the fence, it's not quite right, but the judge wasn't certain where it fell. And not knowing the age, but also not knowing or not enunciating exactly where in these parameters the defendant's behavior fell. Had the judge said, you know, there is clearly no chance for this defendant to rehabilitate whatsoever, had he drawn it in those terms, he wouldn't have to use the considerations necessarily that were set forth in the other cases. He didn't necessarily have to say that he was irretrievably depraved. But there was no indication here that the judge thought that the defendant was utterly without rehabilitative potential. And without that, it can't be said that the judge intended this sentence to be a de facto life sentence, particularly since he rejected the sentence that was suggested by the state and particularly since he was trying to work toward where the line was drawn in those terms. Without that knowledge, it does not appear from the record that the judge intended this to be a de facto life sentence. Well, he intended it to be 62 years, didn't he? And this legal fiction, I mean, it's the law, but it's like the Supreme Court drew a line in the sand at 40 years. And I'm trying to see whether that makes a difference. This judge intended to keep this fellow in prison for 40 years and did point out that the act was evil, that he performed the act eight days after getting out of the juvenile DOC, which shows how much good the juvenile DOC did for him. Everything, even though he didn't say it plainly, I've read the judge's sentencing, the sentencing, and he seems to signal that he believes it's irretrievably depraved. Well, I'll disagree as to whether he's clearly signaled that the defendant was irretrievably depraved. He used strong language describing the circumstances of the offense and the offense itself. He didn't make any sort of indication that a life sentence was appropriate, and he certainly could have gone higher in the sentence that he imposed and dialed it back. And he clearly expressed an inability to state, given the numbers that were provided and the science that was provided, as to, you know, is the age 78, which is, I believe, actually 76 would be about what he would be given that one offense was 85%. But there was a discussion as to, is the range 80? Is it 60? And we also have to keep in mind that the range is much different when you spend 40 years in prison than when you don't spend 40 years in prison. And so what may be a clear age that somebody is going to survive when they're not imprisoned, that's very different when, in fact, they are incarcerated for a lengthy period of time. So living to 56 is not as likely for somebody in prison as it is for somebody who is not. If there are no further questions, then I would ask that this matter be remanded for a new sentencing hearing. Thank you. Thank you, Mr. Wigman. Mr. Leonard? May it please the court. My name is Richard Leonard. I'm an assistant appellate prosecutor, and I represent the people of the state of Illinois. State of Illinois. I argued in my brief that the trial judge went through the factors, and the factors that we disagree on, Mr. Wigman and me, is whether the defendant's previous background contributed to this offense, and whether the trial court considered defendant's rehabilitative potential. Well, the trial court found that the prior upbringing did not affect this offense because this was a premeditated plan. The trial judge characterized the first controlled buy at the gas station as a test run. Then he wanted to buy a large amount of cannabis a few days later, and he suggested a vacant lot, which the seller felt very uncomfortable. He said, why don't we just meet at the restaurant or the gas station again? So that was the plan, and the defendant was walking to the gas station. Obviously, he had a gun on him, and his motive was to obtain this cannabis without paying for it. In doing so, he killed one person, he shot another person who survived, he ran out of bullets. There's a third person in the back seat, and he got away only because the defendant was out of bullets, and that person ran away. Wearing rubber gloves, was he? Yes, he was wearing rubber gloves. Later, when the police went to his house, he had a bonfire going. He was burning those gloves that he had on in his shoes, and they found rubber gloves in the house with the search warrant. This was actually premeditated, and that doesn't apply to the defendant's youth and upbringing. The second one is whether the trial judge considered whether there was any rehabilitative potential. Right here, I have the quote from the trial judge. The trial court found the defendant had little potential for rehabilitation, in part, because of the defendant's bad behavior while incarcerated and waiting to be sentenced. Mr. Wegman cites Holman for, you can't consider a defendant's bad conduct while in prison. But Holman is different. That was, you can't justify a sentence by defendant's bad behavior in prison. In this case, the defendant wasn't sentenced, so the trial court could consider this bad behavior, not only at the juvenile youth center, but the DOJ, because he had not been sentenced yet. In the juvenile facility, he had one of the counselors in the back of the head with the pizza box. Another time, he punched another counselor in the face. Because of those incidents, he was transferred to the JDOC. In that case, his behavior wasn't any better. He punched two, or got in two fights with two different people while in the JDOC. So the trial judge could correctly state, based on this, he had little rehabilitative potential. Now, the trial judge did not have the buffer case by the Supreme Court. But certainly, the trial judge wanted to give the defendant a significant sentence, because he found this individual extremely dangerous, and he found little rehabilitative potential. And he probably believed that this would be a life sentence, since he would not be released until he was in his 70s. But the trial judge stated on the record why he rejected these two claims of his bad behavior, and why his upbringing did not contribute to this. And I don't believe that was an abuse of discretion. Based on the horrendous acts of this individual, a life sentence is supposed to be rare for juveniles. But because of this juvenile's horrendous crimes, this court should find that this is one of those rare circumstances. Now, if you find that one other thing Mr. Wegman argued, that he was arguing things that were not in his brief. However, the trial judge needs to hear those arguments. If they're not argued before the trial judge, you can't argue them before the appellate court. So I would ask that you don't consider those factors. And yes, there has been a change in the law, and that the courts are treating juveniles differently. I know I'm not the same person I am now as when I was 17 years old, but it never contemplated me ever shooting a person for no reason, even if I hated the person at 17 years old. That thought never crossed my mind. I realized this person didn't have a very good upbringing, but he had a sixth grade mentality. But you don't ask any sixth grade class, is it okay to shoot another individual? I'm sure every one of those sixth graders would say, of course not. So under the circumstances and under the trial judge reasoning, I would ask that this court affirm defendant's sentence. Now, if this court finds that this was a improper de facto life sentence and does reverse and remand, I did not make this argument in my brief, so you don't have to consider it. But instead of just remanding the cause for a new sentencing hearing, I believe the trial judge would probably rule the same way that he did before. And we'll be back here in two more years. The main contention why this is a life sentence and it's not a life sentence is the 25-year prison add-on. The trial judge believed that that should be applied, and he put that as part of the sentence. So if he would not have added that on to his sentence, he would have been sentenced to 37 years imprisonment. He would be out when he was about 54 years of age. This would protect not only the public from this dangerous criminal, but for some instance, we can't see the future. And we know that the Department of Corrections isn't really a place of rehabilitation. It's just a place to warehouse people who are bad people to prevent them from hurting citizens on the street. So if this court does disagree with my first argument, I ask that this court just simply decrease defendant's sentence to 37 years imprisonment. And then we won't be back here again in two years if the trial judge does decide to give him another life sentence. With that, I would thank the court for everything. And before I go, I'd like to thank Mr. Wagman for being so concerned with my health problems and my recovery. And I'd like to thank the court, too, for considering my health problems and consideration. And with that, thank you for my argument today. Thank you. Are there any questions, Justice Schmitt or Carter? No. Mr. Wagman for rebuttal. Thank you. First, I'd like to turn to, again, as I had argued that when the trial judge made his ruling, he didn't really know what the target was. But I would also note that at the time, he also was looking at a different purpose. And specifically, the statute that is at issue here refers to, and as Mr. Leonard pointed out, he used it to determine that the 25-year add-on was appropriate. Now, first, I would, again, note that he did so not knowing that that would automatically create a mandatory minimum beyond that which the Supreme Court and Buffer considered to be a de facto sentence. But secondly, again, it shows that the purpose was not to impose a de facto life sentence or to increase the range, but it was a finding by the court that the 25-year add-on was appropriate. Had the court known… I'm sorry, Mr. Wagman, but, you know, looking at this soliloquy or this discussion with the court about that, now, this is on the motion to reconsider. And they're talking about de facto life sentences. And it seems to me that the judge points out that, well, the reason we went through each of these nine factors very carefully was to make sure that the sentence would stand whether or not the Supreme Court decided it was a life, de facto life sentence. In other words, I'm going to give them 6-2 years, but just in case it's considered a de facto life sentence, the court went through all of these nine factors to make sure it was constitutional in the event 62 years was later determined to be a de facto life sentence. I understand what you're saying, but I think that it is difficult, given the investigations that were done, given the arguments that were made by counsel in particular, that it's difficult to say with any certainty that the court intended for this to be a de facto life sentence. And I think that it's imperative that we not just leave it to chance, but that we give the trial judge an opportunity to make that finding, if that's indeed what he intended, rather than risk the very real possibility that the judge did not intend for this to be something that would serve as a de facto life sentence. The Supreme Court has clearly drawn the line at a point considerably below what the trial judge imposed, but the trial judge's sentence was also considerably below that which the state requested, and the state had no difficulty saying that the sentence it requested was a de facto life sentence. But again, neither the court nor counsel nor any of us knew at the time that that was the sentence that was being imposed. And I think that as conscientious as the judge was in considering all of the factors that were used to determine whether he imposed a 25-year add-on, the judge was clearly trying to – at least I think that the record reflects that it could well be that the judge was trying to impose a sentence that was not a de facto life sentence. And that's one of the conundrums of that statute itself, is that it requires that a judge consider those factors before it decides to impose a sentence of 45 years at a minimum. Had that statute been written at a time when it was known that the court was going to find that anything over 40 years was a de facto sentence, I imagine that the legislation would have been written differently. Because of all these questions and because we don't know fully what the judge's intent was, because we do know now that a sentence greater than 40 years is a de facto life sentence, the defendant respectfully requests that this court remand the matter for a new sentencing hearing before the judge. Are there any other questions? No, not for me. I don't see any other questions with that. I want to thank you for your arguments here today, Mr. Letter. We're happy that you're here. Glad you're doing better. Glad we're all getting past this and that hopefully one day, before too long, we'll be able to all be in person together. I would prefer that. Thank you. It would be easier for all of us, I think. But it's great seeing you both in any capacity. And with that, this matter will be taken under advisement. Any written decision will be issued to you in due course. With that, we stand adjourned until next month, I think.